IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KOYE "CORY" TEMILOLA BENSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:19-cv-01161-L |
| | § | |
| UNITED INVESTEXUSA 10, LLC D/B/A | § | |
| NEW WESTERN ACQUISITIONS, | § | |
| UNITED INVESTEXUSA 2, LLC D/B/A | § | |
| NEW WESTERN ACQUISITIONS, | § | |
| UI HOLDINGS, LLC, STUART DENYER, | § | |
| KURT CARLTON, AND PAUL HESS, | § | |
| | § | |
| Defendants. | § | |

## DEFENDANTS' BRIEF IN SUPPORT OF THEIR
## MOTION FOR SUMMARY JUDGMENT

Brant C. Martin
brant.martin@wickphillips.com
State Bar No. 24002529
Molly M. Jones
molly.jones@wickphillips.com
State Bar No. 24100271
Zachary C. Farrar
zachary.farrar@wickphillips.com
State Bar No. 24093418

WICK PHILLIPS GOULD & MARTIN LLP
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone: 817.332.7788
Facsimile:  817.332.7789

**ATTORNEYS FOR DEFENDANTS
UNITED INVESTEXUSA 10, LLC D/B/A
NEW WESTERN ACQUISITIONS, UNITED
INVESTEXUSA 2, LLC D/B/A
NEW WESTERN ACQUISITIONS,
UI HOLDINGS, LLC, STUART DENYER,
KURT CARLTON, AND PAUL HESS**

## TABLE OF CONTENTS

I.   INTRODUCTION AND GROUNDS FOR MOTION ...................................................1

II.  RELEVANT FACTUAL BACKGROUND ..................................................................2

    A.   New Western's Business.........................................................................................2

    B.   Benson Executes an Independent Contractor Agreement with United 10..............3

    C.   Benson's IC Agreement is Terminated for His Usurping United 10's Business
        Opportunities, and United 10 Sues Benson For Breaching His IC Agreement ...... 7

    D.   Two Weeks Before the Temporary Injunction Hearing in the State Case, Benson
        Files This Lawsuit Claiming That He Is An FLSA Employee. ............................. 7

    E.   Benson Represents in the State Case that He is A Contractor and Not an
        Employee. ............................................................................................................. 8

III. ARGUMENT AND AUTHORITIES.........................................................................9

    A.   Summary Judgment Standard. ..............................................................................9

    B.   Benson's Representations to Another Court That He Was a Contractor Bar Him
        from Arguing Otherwise to This Court....................................................................9

    C.   Benson's Overtime Claim Fails Because He Was A Contractor, Not An Employee
        Under The FLSA...................................................................................................11

        1.   Benson controlled the manner and method of his work and could engage
            with whatever investors or property owners he chose on a deal-by-deal
            basis. ........................................................................................................12

        2.   Benson supplied his own work materials...................................................14

        3.   Benson fully controlled his own profits and losses. ..................................15

        4.   Benson's initiative and skill were key factors to his success.....................16

        5.   Degree of permanence also weighs in favor of a contractor
            relationship...............................................................................................17

        6.   Other factors also point to the fact that Benson is an independent
            contractor. ................................................................................................18

    D.   Even If Benson Were An FLSA Employee, He is an Exempt Outside Salesman
        Not Entitled to Overtime Pay...............................................................................18

    E.   All Defendants Other than United 10 Should Be Dismissed Because Only United
        10 Can Possibly Be An "Employer" Under The FLSA. .......................................21

i

F.     If Any Alleged FLSA Violation Existed, It Was Not Willful. .............................24

**IV.    CONCLUSION** ..............................................................................................................**25**

## <u>TABLE OF AUTHORITIES</u>

Page(s)

Cases

*Albertson v. T.J. Stevenson & Co.*,
   749 F.2d 223 (5th Cir.1984) ............................................................................. 11

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986)........................................................................................... 9

*Carrell v. Sunland Const., Inc.*,
   998 F.2d 330 (5th Cir. 1993) ........................................................................... 11

*Eberline v. Media Net, L.L.C.*,
   636 F. App'x 225 (5th Cir. 2016) ........................................................ 11, 14, 16

*Encino Motorcars, LLC v. Navarro*,
   138 S. Ct. 1134 (2018)..................................................................................... 19

*Faludi v. U.S. Shale Solutions, L.L.C.*,
   950 F.3d 269 (5th Cir. 2020) ..................................................................... 14, 17

*Gray v. Powers*,
   673 F.3d 352 (5th Cir. 2012) ..................................................................... 22, 23

*Hickey v. Arkla Indus., Inc.*,
   699 F.2d 748 (5th Cir. 1983) ............................................................. 13, 14, 16

*Johnson v. Idexx Labs., Inc.*,
   No. 3:06-CV-381-M, 2007 WL 1650416 (N.D. Tex. June 4, 2007) ....................... 10

*Martinez v. Superior HealthPlan, Inc.*,
   371 F. Supp. 3d 370 (W.D. Tex. 2019)................................................................ 21

*McLaughlin v. Richland Shoe Co.*,
   486 U.S. 128 (1988)......................................................................................... 24

*Meza v. Intelligent Mexican Marketing, Inc.*,
   720 F.3d 577 (2013).......................................................................................... 21

*New Hampshire v. Maine*,
   532 U.S. 742 (2001)........................................................................................... 9

*Parrish v. Premier Directional Drilling, L.P.*,
   917 F.3d 369 (5th Cir. 2019) ..................................................................... passim

iii

*Perdomo v. Ask 4 Realty & Mgmt., Inc.*,
    298 F. App'x 820 (11th Cir. 2008) ......................................................... 18

*Reed v. City of Arlington*,
    650 F.3d 571 (5th Cir. 2011) ......................................................... 9, 10

*Reneau v. Trung Nguyen*,
    No. 6:16-CV-01126-JDK, 2019 WL 348250 (N.D. Tex. Jan. 9, 2019) ................. 23

*Steele v. Leasing Enterprises, Ltd.*,
    826 F.3d 237 (5th Cir. 2016) ......................................................... 24

*Talbert v. Am. Risk Ins. Co.*,
    405 F. App'x 848 (5th Cir. 2010) ..................................................... 17

*Tharp v. Energes LLC*,
    No. 5:15-CV-983-DAE, 2016 WL 3352203 (W.D. Tex. June 15, 2016) ................ 23

*Thibault v. Bellsouth*
    612 F.3d 843 (5th Cir. 2010) ........................................... 13, 15, 17, 18

*Tran v. St. Luke's Episcopal Health Sys.*,
    No. CIV.A. H-11-0241, 2012 WL 3985219 (S.D. Tex. Sept. 11, 2012) ............... 24

*U.S. ex rel. Long v. GSDMIdea City, L.L.C.*,
    798 F.3d 265 (5th Cir. 2015) ......................................................... 9, 10

*Williams v. Henagan*,
    595 F.3d 610 (5th Cir. 2010) ......................................................... 22

Statutes

29 U.S.C. § 201 ............................................................................... 1

Rules

Federal Rule of Civil Procedure 5(b)(2) ..................................................... 26
Federal Rule of Civil Procedure 56 ........................................................ 1, 9

Regulations

29 C.F.R. § 541.500(a)(1)-(2) ............................................................... 19
29 C.F.R. § 541.503 ........................................................................ 21

Other Authorities

18B Fed. Prac. & Proc. Juris. § 4477 (2d ed. 2015) ......................................... 10

Defendants United InvestexUSA 10, LLC d/b/a New Western Acquisitions ("United 10"), United InvestexUSA 2, LLC d/b/a New Western Acquisitions ("United 2") (collectively, "New Western"), UI Holdings, LLC ("UI Holdings"), Stuart Denyer ("Denyer"), Kurt Carlton ("Carlton") and Paul Hess ("Hess") (Denyer, Carlton, and Hess are collectively, the "Individual Defendants," and along with New Western and UI Holdings are collectively, "Defendants") hereby file this brief in support of their motion for summary judgment under Federal Rule of Civil Procedure 56 and Local Rules 56.3-7 of the U.S. District Court for the Northern District of Texas.

## I.     INTRODUCTION AND GROUNDS FOR MOTION

Plaintiff Koye "Cory" Temilola Benson ("Benson"), a former highly-paid real estate agent for United 10, earned more than $316,000 in just over two years. As is standard for real estate agents, Benson was a statutory non-employee, who worked as an independent contractor and was paid though commissions. After United 10 ended Benson's contract and sued him for breaching his restrictive covenants with it, Benson contended for the first time that he was actually an employee owed overtime pay under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.* (the "FLSA"). That claim has no merit, and in fact, appears to have been asserted in a misplaced attempt to create leverage against United 10 in its lawsuit against him. Defendants seek summary judgment of Benson's claims based on the following grounds:

*First*, Benson admitted to another court that he was an independent contractor for United 10 and should be estopped from asserting a contrary position in this action.

*Second*, as a matter of law Benson was not employed by Defendants under the FLSA— he was an independent contractor—and, accordingly, he is not eligible for overtime pay.

*Third*, even if Benson were a United 10 employee, dismissal of his claim is still appropriate because he qualifies for the FLSA's outside sales exemption and is not entitled to overtime pay.

*Fourth*, Benson cannot establish that any Defendant other than possibly United 10 could qualify as his "employer" under the FLSA.  Therefore, the claims against all Defendants except United 10 should be summarily dismissed.

*Finally*, even if Benson were covered by the FLSA (which he is not), he cannot show that any Defendant engaged in a willful violation of that statute. Therefore, a two-year statute of limitations period, rather than a three-year period, is applicable.

## II.    RELEVANT FACTUAL BACKGROUND

### A.    New Western's Business.

1.    New Western Acquisitions is a nationwide real estate brokerage specializing in residential real estate investing.  Each brokerage is organized and operates as an individual entity run by a General Manager. United 10 is based in Denton, Texas. United 2 is based in Fort Worth, Texas.  UI Holdings is the parent entity of United 10 and United 2.  Unlike United 10 and United 2, no employees or contractors work directly for UI Holdings. Def. App. 050-051 (Declaration of Paul Hess ("Hess Decl.") ¶ 2).[1]

2.    Stuart Denyer is the Chief Executive Officer of United 10 and United 2, and Kurt Carlton is the Chief Technology Officer of those entities. Paul Hess is the Chief Financial Officer of United 10 and United 2 and also serves as General Counsel. Def. App. 051 (Hess Decl. ¶ 3).

3.    Like other real estate brokerages, New Western contracts with real estate agents to facilitate property acquisitions and sales. There are two types of agents at New Western: acquisition agents who find and acquire properties for New Western to sell, and dispositions (or sales) agents who locate investors to buy investment properties. Typically, agents at New Western

---

[1] The record citations herein refer to the Appendix in Support of Defendants' Motion for Summary Judgment, filed contemporaneously along with this Motion. Each record citation references the page number in the Appendix ("Def. App.") and includes a description of the document referenced and the page or paragraph number.

begin as sales agents, but some later also serve as acquisition agents. Def. App. 003 (Declaration of J.D. Castillo ("Castillo Decl.") ¶ 4); Def. App. 194 (Deposition of Cory Benson ("Benson Dep.") 55:3-9).

4.      New Western's business differs from traditional residential real estate in its focus on high-volume residential real estate investing. New Western's acquisition agents locate properties suitable for real estate investing, typically distressed or under-valued properties, which are then conveyed to investors either through a sale or contract assignment. New Western's properties are not listed on the MLS, but instead are internal confidential information of New Western for its sales agents to market to its investors. Def. App. 003 (Castillo Decl. ¶ 5).

5.      New Western agents are considered and treated strictly as independent contractors and statutory non-employees and are paid solely on commission.  Def. App. 052 (Hess Decl. ¶ 9).

**B.      Benson Executes an Independent Contractor Agreement with United 10.**

6.      Benson provided services to United 10 as an independent contractor from January 2016 to April 4, 2018.  Def. App. 191 (Benson Dep. 39:6-11); Def. App. 004, 011 (Castillo Decl. ¶¶ 11, 30).  JD Castillo was the General Manager of United 10 during Benson's time there.  Def. App. 193 (Benson Dep. 52:21-23); Def. App. 004 (Castillo Decl. ¶ 7).

7.      On or around January 7, 2016, Benson signed an Independent Contractor Agreement with United 10 (the "IC Agreement").  Def. App. 191, 220-230 (Benson Dep. 39:14-40:24 and Benson Dep. Exh. 1); Def. App. 004, 013-023 (Castillo Decl. ¶ 11 and Castillo Decl. Exh. A-1 (IC Agreement)). The IC Agreement provides that Benson is an independent contractor and is paid solely through commission. Def. App. 013-023 (Castillo Decl. Exh. A-1 (IC Agreement)). The IC Agreement also states that Benson must furnish his own work material, pay his own business expenses, and is responsible for his own means and methods of work. *Id.* The IC

Agreement contemplates Benson's ability to engage with his own employees or subcontractors. *Id.*; *see also* Def. App. 010 (Castillo Decl. ¶ 27).

8.      Benson was an independent contractor for United 10 for his entire relationship with New Western. Just prior to the termination of his IC Agreement, Benson had arranged to move to the Fort Worth office to provide services for United 2. Def. App. 193 (Benson Dep. 52:17-20); Def. App. 010 (Castillo Decl. ¶ 29).  However, due to information learned by Mr. Castillo in early April 2018, Mr. Benson's IC Agreement was terminated. *Id.*

9.      Benson's primary responsibility as a United 10 agent was to make sales to investors and procure properties for acquisition.  Def. App. 194 (Benson Dep. 56:9-10); Def. App. 005, 014 (Castillo Decl. ¶ 14 and Castillo Decl. Exh. A-1 (IC Agreement)). Benson worked as both an acquisition agent and sales agent and was very successful. Def. App. 194 (Benson Dep. 55:3-21); Def. App. 005 (Castillo Decl. ¶ 13). He was the top acquisition agent and the top sales agent for United 10 as of early 2018.  Def. App. 193 (Benson Dep. 54:25-55:2). To do so, he had to build his own book of business on behalf of United 10 and to locate investors for United 10 properties using the methods he chose. Def. App. 197 (Benson Dep. 69:24-70:3). Benson had his own way of finding investors for New Western properties apart from activities recommended by United 10. Def. App. 194 (Benson Dep. 58:12-19).

10.      Indeed, each agent's way of performing agent activities was different.  Def. App. 194 (Benson Dep. 57:7-9).  Benson located his own investors on behalf of United 10. Def. App. 194 (Benson Dep. 57:22-58:2). Although United 10 would provide leads to agents from time to time, following up on those leads was optional.  Def. App. 008-009 (Castillo Decl. ¶ 23).  Benson actually told Mr. Castillo that he did not want to receive leads from United 10. Def. App. 194 (Benson Dep. 58:3-11); Def. App. 008-009 (Castillo Decl. ¶ 23).

11.     New Western agents spend a substantial amount of time outside of the office. According to Mr. Castillo, United 10 agents should spend time outside the office every day performing activities like visiting properties, going to showings and investor or homeowner meetings, looking for potential acquisition properties, or attending networking events. Def. App. 005 (Castillo Decl. ¶ 12). Benson regularly performed these kinds of out-of-office activities. Def. App. 195, 199, 208, 209-219 (Benson Dep. 59:6-24, 76:2-8, 108:5-18, 113:14-24, 122:25-123:8). Activities performed inside the office (or in another location), such as calling investors, arranging meetings with investors or homeowners, reviewing properties, and working on sales and acquisition documents, are necessary to an agent's sales activities and relate to and support an agent's out-of-office activities.  Def. App. 006 (Castillo Decl. ¶ 15).

12.     Likewise, being a New Western agent requires a great deal of driving.  Def. App. 184 (Benson Dep. 14:20-22).  New Western agents own their own vehicles and pay all expenses related to the vehicles, including insurance and gas. Def. App. 015 (Castillo Decl. Exh. A-1 (IC Agreement)).  In addition to needing a car, Benson needed a computer and a cell phone in his work as a United 10 agent.  He provided his own computer and cell phone and paid his own cell phone bill. Def. App. 200 (Benson Dep. 79:5-18). Benson was never reimbursed for business expenses by United 10.  Def. App. 192 (Benson Dep. 47:19-21).

13.      Benson was not provided traditional employee benefits by United 10, such as health benefits or paid time off.  Def. App. 192 (Benson Dep. 47:22-25).

14.     As an agent, Benson was running his own business on behalf of United 10 and using its platform and proprietary information.  Def. App. 200 (Benson Dep. 81:21-82:2); Def. App. 006-007 (Castillo Decl. ¶ 17).  He maintained his own LLC during part of his engagement at United 10, called KTB Compass Enterprises, LLC ("KTB Compass"). Def. App. 185 (Benson Dep. 17:9-

11); Def. App. 006-007 (Castillo Decl. ¶ 17).  Benson set up KTB Compass for tax purposes during the time period when he was a United 10 agent. Def. App. 189 (Benson Dep. 32:22-25). Even after his relationship with United 10 ended, Benson continued to run KTB Compass, and it continues to operate in the real estate business. Def. App. 185, 189 (Benson Dep. 16:23-17:1, 32:3-5).

15.     Benson negotiated with Mr. Castillo to increase his commission rate in September 2017. Def. App. 204 (Benson Dep. 96:16-21); Def. App. 005, 024-025 (Castillo Decl. ¶ 12 and Castillo Decl. Exh. A-2 (IC Agreement Addendum)).

16.     While he was a United 10 independent contractor, Benson deducted business expenses from his tax returns. *See* Def. App. 231-274 (Benson's 2016-2018 Tax Returns[2]). Benson took deductions for expenses like his real estate license fees (Def. App. 200 (Benson Dep. 81:13-18)), standard mileage, and client entertainment (Def. App. 231-274 (Benson's 2016-2018 Tax Returns)).

17.     New Western's records show that Benson was paid more than $316,000 in commissions between January 2016 and April 4, 2018. Def. App. 052-053, 056-069 (Hess Decl. ¶ 10; and Hess Decl. Exh. B-1). Benson himself believes he might have even earned *more* than this amount while he was a New Western agent. Def. App. 202 (Benson Dep. 90:16-91:9).

18.     Because Benson was an independent contractor, United 10 did not require him to track his time.  Def. App. 006-007 (Castillo Decl. ¶ 17).  He did not clock in or out and kept no independent records, calendars, or even notes related to the amount of time that he spent working

---

[2]  Although Benson's tax returns are not Bates labeled, his attorney produced them to Defendants' counsel on April 20, 2020.

for United 10.[3] Def. App. 216 (Benson Dep. 149:3-11). He does not remember the number of hours he worked in any particular workweek. *See* Def. App. 215 (Benson Dep. 146:15-148:17).

**C.     Benson's IC Agreement is Terminated for His Usurping United 10's Business Opportunities, and United 10 Sues Benson For Breaching His IC Agreement.**

19.     Benson's contractor relationship was terminated on April 4, 2018, after Mr. Castillo learned that he had violated his IC Agreement and usurped United 10's business opportunity on at least one real estate transaction.   On or around April 3, 2018, Mr. Castillo discovered that, in January 2018, Benson was involved in a real estate transaction solely through KTB Compass, and Benson (and KTB Compass) received all of the fees.  Def. App. 010-011 (Castillo Decl. ¶ 30). Mr. Castillo decided to terminate Benson's IC Agreement. *Id.*

20.     On June 20, 2018, United 10 filed suit against Benson and KTB Compass (the "State Case").[4]  In the State Case, United 10 asserts a breach of contract cause of action, among others, arising out of Benson's violations of certain restrictive covenants in the IC Agreement. Def. App. 053 (Hess Decl. ¶ 12).

**D.     Two Weeks Before the Temporary Injunction Hearing in the State Case, Benson Files This Lawsuit Claiming That He Is An FLSA Employee.**

21.     In the State Case, United 10 applied for a temporary injunction requesting that the court enjoin Benson from violating the restrictive covenants in the IC Agreement. The hearings on the temporary injunction occurred on May 24 and 29, 2019. Def. App. 053 (Hess Decl. ¶ 13).  Less than two weeks before the first hearing, on May 15, 2019, Benson filed the instant lawsuit. *Id.*

22.     United 10's request for a temporary injunction against Benson was granted. *Id.*

---

[3] Given these facts, it is not surprising that Benson claims to have no idea (not even a "ballpark" estimate) what his alleged unpaid overtime damages are. Def. App. 215 (Benson Dep. 144:25-145:21).

[4] The State Case is styled *United InvestexUSA 10, LLC d/b/a New Western Acquisitions v. Koye "Cory" Temilola Benson and KTB Compass Enterprises, LLC*, Cause No. DC-18-08057, currently pending in the 298th Judicial District Court Dallas County, Texas.

**E.      Benson Represents in the State Case that He is A Contractor and Not an Employee.**

23.      United 10 also filed a Motion for Partial Summary Judgment in the State Case requesting that the court find that (a) the Independent Contractor Agreement between United 10 and Benson is valid and enforceable and (b) Benson breached it. Def. App. 053, 070-155 (Hess Decl. ¶ 14 and Hess Decl. Exh. B-2 (Plaintiff's [United 10's] Motion for Partial Summary Judgment)).

24.      Benson filed his Response to United 10's Motion for Partial Summary Judgment in the State Case wherein Benson took a position *completely opposite* to the position he takes in this suit—*i.e.*, that Benson was never an employee of United 10 but, instead, an independent contractor. In pertinent part, Benson's Response reads:

> Here, ***Mr. Benson was not an employee of [United 10] but was an independent contractor*** – a contractor owes no fiduciary duty (sic) a former employer.

Def. App. 053-054, 156-177 (Hess Decl. ¶ 15 and Hess Decl. Exh. B-3 (Defendant's [Benson's] Response to Plaintiff's Motion for Partial Summary Judgment)).

25.      United 10's Motion for Partial Summary Judgment was granted. Def. App. 054, 178-179 (Hess Decl. ¶ 16 and Hess Decl. Exh. B-4 (Order on Motion for Partial Summary Judgment)).

26.      Until filing this lawsuit, Benson never complained that he should be receiving overtime pay.[5] Def. App. 187, 203 (Benson Dep. 25:3-7, 95:1-5); Def. App. 011 (Castillo Decl. ¶ 31).  In fact, when Benson had questions or issues with his commissions, he raised those with New Western and the issue was addressed.  Def. App. 205 (Benson Dep. 99:7-102).

---

[5] Benson filed the instant lawsuit 13 months after his IC Agreement with United 10 was terminated, but only 9 days before the hearing on its temporary injunction application in the State Case. This timing speaks volumes about the motivation behind (and merits of) the recently-concocted claim.

## III.   ARGUMENT AND AUTHORITIES

### A.   Summary Judgment Standard.

Pursuant to Fed. R. Civ. P. 56, courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Although summary judgment evidence must be viewed in a light most favorable to a non-movant, "'the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* [dispute] of *material fact*.'" *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247–48 (1986)) (emphasis in original). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Parrish*, 917 F.3d at 378 (internal quotation omitted).

### B.   Benson's Representations to Another Court That He Was a Contractor Bar Him from Arguing Otherwise to This Court.

Benson should be estopped from taking opposite positions regarding his employment status in the State Case and this case.  Judicial estoppel is an equitable doctrine that a court may invoke in its discretion that prevents litigants from taking inconsistent positions in different legal proceedings to suit their own needs. *U.S. ex rel. Long v. GSDMIdea City, L.L.C*., 798 F.3d 265, 271 (5th Cir. 2015) (citing *New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001)); *Reed v. City of Arlington*, 650 F.3d 571, 573 (5th Cir. 2011) (en banc).  No "inflexible prerequisites" or "exhaustive formula" exists for determining when the application of judicial estoppel is appropriate. *Id.* (citing *Reed*, 650 F.3d at 574).

The Fifth Circuit has set forth the following factors that courts may consider when determining judicial estoppel: (1) whether the party took a position that is "plainly inconsistent

9

with a prior position," (2) whether the "court accepted the position," and (3) whether "the party did not act inadvertently." *Reed*, 650 F.3d at 574. However, different considerations may be appropriate in different contexts. *Id.* "[C]ourts should determine if applying judicial estoppel is appropriate in light of the specific facts of each case and the doctrine's purpose of 'protect[ing] the integrity of the judicial process.'" *Long*, 798 F.3d at 271 (citing *Reed*, 650 F.3d at 574).

Here, the equities strongly favor application of judicial estoppel. There can be no question that Benson takes directly opposing positions: he insists in the State Case that he is an independent contractor, but contends here that he is an employee.  In particular, in the State Case, he stated as follows: "Here, Mr. Benson was not an employee of [United 10] but was an independent contractor – a contractor owes no fiduciary duty (sic) a former employer."[6]  Ultimately, the court in the State Case upheld the validity of the IC Agreement, which provided that Benson was an independent contractor, as Benson had urged. Finally, Benson's admission that he was a contractor—made in a brief to the court—cannot be characterized as inadvertent. To the contrary, he affirmatively asserted the position to attempt to avoid liability to United 10. Accordingly, judicial estoppel should apply to prevent Benson from playing "fast and loose" with the integrity of this Court. Wright & Miller, Preclusion of Inconsistent Positions—Judicial Estoppel, 18B Fed. Prac. & Proc. Juris. § 4477 (2d ed. 2015) ("Courts also focus on the sheer effrontery of advocates who, by playing 'fast and loose' with the courts, seem in the pursuit of wanton self-interest to trifle with the dignity of judicial truth-finding effort.").

At the very least, the Court should consider Benson's representation that he is, in fact, an independent contractor as an evidentiary admission against him. *See Johnson v. Idexx Labs., Inc.*,

---

[6] It is unclear why Benson argued that he did not owe United 10 a fiduciary duty since United 10 did not contend that Benson *did* owe it a fiduciary duty. It argued only (and accurately) that Benson received confidential information as consideration for the restrictive covenants he agreed to.

No. 3:06-CV-381-M, 2007 WL 1650416, at *2 (N.D. Tex. June 4, 2007) (citing *Albertson v. T.J. Stevenson & Co*., 749 F.2d 223, 228 (5th Cir.1984)) ("a party cannot create an issue of fact in the face of an evidentiary admission unless the party contradicts and explains the disavowed statement").

**C.      Benson's Overtime Claim Fails Because He Was A Contractor, Not An Employee Under The FLSA.**

Benson bears the burden of establishing that he was an "employee" within the definition of the FLSA, such that the Act's overtime requirements apply to him. *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 227-28 (5th Cir. 2016). When determining whether an individual is an employee or an independent contractor courts consider these non-exhaustive factors:

> the degree of control exercised by the alleged employer, the extent of the relative investments of the worker and alleged employer, the degree to which the worker's opportunity for profit and loss is determined by the alleged employer, the skill and initiative required to perform the job, and the permanency of the relationship.

*Id.; Carrell v. Sunland Const., Inc.*, 998 F.2d 330, 332 (5th Cir. 1993).  No single factor is determinative, rather the overarching question in the inquiry is whether Benson was economically dependent on New Western, or whether he was, in fact, in business for himself.  *Parrish*, 917 F.3d at 379.  The economic reality test is a fact-dependent inquiry often involving "facts pointing in both directions." *Id.* (citing *Carrell*, 998 F.2d at 334). That, however, does not preclude a court from finding that summary judgment is appropriate. *See id.*

Here, when looking at these and other factors as a whole, the undisputed facts show that Benson was not economically dependent on United 10 but was a successful real estate agent who was in business for himself using United 10's platform and confidential information.

**1.      Benson controlled the manner and method of his work and could engage with whatever investors or property owners he chose on a deal-by-deal basis.**

An evaluation of the relevant control factors reflects that Benson and New Western did not have an employment relationship.  Although Benson will undoubtably emphasize the purported "control" he contends Mr. Castillo exercised over him, Benson's testimony shows that he alone controlled the most essential aspects of his work as an agent and that he was free to engage in whatever real estate deals he chose on behalf of United 10.

First, Benson admits that he controlled the means and methods of his services as an independent contractor and that United 10 did not dictate *how* he did his work.  Crucial to an agent's success is finding and cultivating relationships with investors on behalf of United 10.  Def. App. 004 (Castillo Decl. ¶ 9). Benson was successful at this, and, in fact, was the top agent in the Denton office for some time.  Def. App. 194 (Benson Dep. 56:25-57:2); Def. App. 005 (Castillo Decl. ¶ 13). Benson testified that, as to this essential aspect of his work, he had his own means and methods.  He had his own ways of finding investors and leads on behalf of United 10 and, in fact, according to Benson, United 10 *did not even have* a method that it required or preferred agents to use. Def. App. 194, 206-207 (Benson Dep. 58:3-19, 106:21-107:1).  Underscoring an agent's freedom to find whatever methods that worked for them, United 10 asked Benson to offer training to other agents on his methods, which Benson did and which he believes helped other agents. Def. App. 207 (Benson Dep. 109:7-15).  Benson's control over his own manner and method of work weighs significantly in favor of contractor status. *See Parrish,* 917 F.3d at 381.

Second, although the work of a real estate agent is not project-based in a traditional sense, an agent's work is deal by deal.  Each property acquisition or sale is a separate transaction in which Benson could choose to engage.  United 10 never "assigned" Benson to work with certain investors or sellers, and he was responsible for building his own book of business with whom he would work

on behalf of United 10.[7] Def. App. 006-007 (Castillo Decl. ¶ 17); Def. App. 197 (Benson Dep. 69:24-70:3). Indeed, when United 10 did provide sales leads to Benson, he declined to use those leads—without repercussion—and requested to no longer receive leads. Def. App. 197 (Benson Dep. 69:24-70:3). Benson's ability to work on whatever real estate deals he chose also strongly supports the fact that he was not under United 10's control. *See, e.g., Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 751 (5th Cir. 1983) (finding plaintiff to be an independent contractor where defendant did not control which customers he could call upon or his advertising or marketing efforts and did not require reporting of daily time or activities).

Based on these facts, the control factor leans in favor of Benson's independent contractor status. For example, in *Parrish*, directional drillers were found to be contractors where plaintiffs controlled the manner or the method of the work and could accept or reject projects, even though plaintiffs contended defendant controlled their day-to-day activities, such as work schedules, and instructed them when and where to work. 917 F.3d at 381. Likewise, in *Thibault v. Bellsouth Telecomm.*, plaintiffs were found to be contractors even though defendant maintained daily time records and required them to work the same hours and days as defendant's employees. 612 F.3d 843, 847-48 (5th Cir. 2010). But because plaintiffs considered themselves to be contractors, had control of their own manner and method of work, and, once assigned to a job, would have the freedom to decide how to fix the problem, they were ultimately deemed to be contractors. *Id.* The same conclusion should be reached here.

---

[7] The information regarding investors and properties Benson located on behalf of United 10 still became (and remains part) of United 10's confidential information. The IC Agreement provides that "information relating to customers and investors (including customer, prospective customer, investor, and prospective investor lists)" is United 10's "Confidential Information." Def. App. 018, 019 (Castillo Decl. Exh. A-1(IC Agreement)). Further, "records, files, notes, and other documents or materials, whether in written or electronic form, relating to the Company of its operations, business or affairs that [Benson] shall prepare, use, or be provided" are the "exclusive property of the Company." *Id.*

### 2.     Benson supplied his own work materials.

Second, the relative investments of the worker and alleged employer also weighs in favor of the existence of an independent contractor arrangement.

Benson invested in his own work materials that he needed to perform agent services—a vehicle, insurance, a computer, a cell phone, and a real estate license. These types of expenditures also support contractor status. *See Faludi v. U.S. Shale Solutions, L.L.C.*, 950 F.3d 269, 276 (5th Cir. 2020) (affirming a contractor relationship where plaintiff provided his own computer, phone, and continuing education expenses); *Eberline*, 636 F. App'x at 228 (finding existence of independent contractor status where plaintiffs provided, in part, their own tools and supplies). Although New Western paid his real estate license fees, those expenses were deducted from his commissions. Def. App. 052 (Hess Decl. ¶ 9); Def. App. 007 (Castillo Decl. ¶ 18). Benson also regularly claimed tax deductions related to business expenses including those related to his cell phone and vehicles. *See, e.g.,* Def. App. 234-235, 250-251, 266-267 (2016-2018 Tax Returns).

As for United 10's investment, it supplied office space and a proprietary software system to assist agents in doing their work. Def. App. 004 (Castillo Decl. ¶¶ 7, 8). Taking into account that a dozen or so agents can use the office at any one time (totaling dozens of agents since United 10 began) and all New Western brokerages use the proprietary software system, the relative investment of New Western, *as to Benson*, is minimal. This factor supports a finding of a contractor relationship. *See, e.g., Hickey,* 699 F.2d at 752 (finding that plaintiff's provision of vehicle and travel expenses, though of minimal expense, had a direct relationship to the cost of operating his business, while the office space furnished by defendant was dispensable to plaintiff's business).

**3.      Benson fully controlled his own profits and losses.**

Third, Benson's opportunity for profit and loss was determined solely by him, indicative of his contractor status. This factor focuses on a worker's ability to control his own costs and income. *Parrish,* 917 F.3d at 384.  Here, the evidence shows that Benson was responsible for pursuing consistent work by finding his own investors and properties; he did not receive pay from New Western when he did not sell or acquire properties (*i.e.*, he earned commissions on a deal-by-deal basis); he negotiated a higher commission rate from New Western in 2017; and decided for himself what business expenses to incur. Def. App. 197, 204 (Benson Dep. 69:24-70:1, 96:16-21); Def. App. 007 (Castillo Decl. ¶ 18). These factors point toward a contractor relationship. *See id.*; *see also, Thibault*, 612 F.3d at 848 (finding that plaintiff's ability to consistently find work and to increase profits by controlling costs leaned toward a contractor relationship).

Courts also find that tax returns provide useful evidence regarding profits and losses. *Parrish,* 917 F.3d at 384.  Benson's tax returns demonstrate that he determined where to spend money—and where not to—to maximize his profits. In 2016 and 2017, Benson's business expenses comprised approximately 60% of his gross income each year. Def. App. 234 (Benson's 2016 Tax Return) (showing a total of $42,476 in business expenses from his gross income of $71,566); Def. App. 250 (Benson's 2017 Tax Return) (showing a total of $129,057 in business expenses from his gross income of $213,489). The tax returns also show Benson choosing to allocate his expenses differently in those years.  For instance, he spent only $320 in advertising in 2016 (less than 1% of his gross income), but in 2017, he spent $9,978 in advertising (over 4% of his income). Similarly, in 2016, his tax returns show Benson had expenses of $9,680 for client entertainment and, in 2017, he chose to spend more than three times as much, $32,457, for client

entertainment.[8] Def. App. 234 (Benson's 2016 Tax Return); Def. App. 250 (Benson's 2017 Tax Return). Between those two years, perhaps due to his increased advertising and business development efforts, his profit almost tripled. The ability to make decisions on how to allocate resources to maximize profits and minimize losses rested solely with Benson. That fact strongly favors to a contractor relationship. *Parrish,* 917 F.3d at 384.

### 4.    Benson's initiative and skill were key factors to his success.

Fourth, Benson cannot dispute—and in fact admitted—that his success as an independent contractor stemmed solely from his own initiative and skill as a salesman.  This ability to exercise "significant initiative within the business" weighs in favor of a contractor relationship. *Eberline*, 636 F. App'x at 228-29.

Benson was a highly successful agent, earning much more than many other agents, which he attributes entirely to his initiative—in Benson's own words he "worked [his] butt off" to make over \$316,000 in commissions.  Def. App. 203 (Benson Dep. 92:25-93:2); Def. App. 005 (Castillo Decl. ¶ 13). Benson "put[] [his] own grind into it," "hustled" and "found a different way to find investors." Def. App. 206 (Benson Dep. 106:15-20).  He was responsible for locating his own investors to work with on behalf of United 10 and building his own book of business at United 10. Def. App. 197 (Benson Dep. 69:24-70:3). Benson's ability to increase his income based upon his own initiative and ability to secure additional sales and acquisitions is a strong indication that he was a contractor, and not an employee.  *See, e.g., Hickey*, 699 F.2d at 752 (finding that, where plaintiff contractor was paid solely on commission, his success was dependent on his own initiative, judgment, and foresight); *Eberline*, 636 F. App'x at 228-29 (concluding that plaintiffs

---

[8] Although Benson testified at his deposition that he did not have expenses related to investors (*see* Def. App. 200 (Benson Dep. 79:19-23)), his tax returns plainly tell a different story.

exercised initiative indicative of a contractor relationship where they, in part, determined their own efficiency and could choose to perform additional work for clients).

### 5.   Degree of permanence also weighs in favor of a contractor relationship.

Finally, Benson's work with United 10 was not a permanent or exclusive relationship. Although Benson testified that he did not have another job while he was a United 10 agent— outside of running KTB Compass—he said it was common for agents to have other jobs. Def. App. 196 (Benson Dep. 63:17-23). Benson was not prohibited from employment or business activities, other than those set forth in the restrictive covenants in his IC Agreement. Though Benson was prohibited from competing with United 10's business by his IC Agreement, among other things, the mere existence of a non-compete "does not automatically negate independent contractor status." *Faludi*, 950 F.3d at 276 (citing *Talbert v. Am. Risk Ins. Co*., 405 F. App'x 848, 856 (5th Cir. 2010)).

For part of his agent relationship, Benson owned and operated KTB Compass, his own LLC through which he conducted his United 10 business.  Def. App. 185 (Benson Dep. 17:19-21). KTB Compass continued to operate in the real estate business even after Benson's contractor relationship with United 10 ended. Def. App. 185 (Benson Dep. 16:23-17:1). Benson also had the opportunity to provide services for different New Western entities in addition to United 10.  During his time as an agent for United 10, he sold properties for other New Western entities.  Def. App. 052-053 (Hess Decl. ¶ 10). Then, in early 2018, he had arranged to begin working with United 2 in Fort Worth (though before this could occur, Benson's IC Agreement was terminated due to his prior bad acts). Def. App. 010 (Castillo Decl. ¶ 29). These facts point toward a contractor relationship. *See Thibault*, 612 F.3d at 849.

6.      Other factors also point to the fact that Benson is an independent contractor.

In addition to the factors above, courts often consider other circumstances when making these determinations. *Parrish,* 917 F.3d at 387-88. Here, consideration of other factors tips the scales in favor of a contractor relationship.  Benson considered himself to be a contractor (at least until 13 months after his relationship with New Western ended), held himself out to the IRS as a contractor (both in the form of his tax filing and substance of his tax returns), and even held himself out *to another court* as a contractor. *See, e.g., Thibault*, 612 F.3d at 846, 849. In considering the overall circumstances, it is clear that as an economic reality, Benson was economically dependent on himself, not on United 10.  As a skilled salesman and a sophisticated real estate professional, he used New Western's platform and confidential information to build his own real estate business on behalf of United 10 and to make his own profits. That is a contractor relationship. *See Thibault*, 612 F.3d at 849.

Finally, United 10's classification of Benson—a licensed real estate agent—as a contractor is typical in the real estate industry. That classification is so common that only one federal court opinion was located regarding the contractor status of a real estate agent. The district court there held that the agent was a contractor and that finding that was affirmed by the Eleventh Circuit Court of Appeals. *See Perdomo v. Ask 4 Realty & Mgmt., Inc*., 298 F. App'x 820 (11th Cir. 2008).

Accordingly, because there is no genuine issue of material fact related to Benson's classification as an independent contractor, summary judgment dismissal is proper.

**D.      Even If Benson Were An FLSA Employee, He is an Exempt Outside Salesman Not Entitled to Overtime Pay.**

As a contractor, Benson is not eligible for overtime pay.  If he were an employee, however, Benson would *still* not be entitled to overtime pay because he was an exempt outside salesperson under the FLSA.

Benson qualifies for the FLSA's outside sales exemption because: (1) his primary duty was making real estate sales to buyers and to contract with property owners to sell their homes, and (2) he customarily and regularly conducted such business away from United 10's office.  29 C.F.R. § 541.500(a)(1)-(2).  Importantly, the Supreme Court requires FLSA exemptions to be fairly (rather than narrowly) construed.  *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).

If real estate agents are employees, the Department of Labor explicitly recognizes that they are generally exempt from overtime under the outside sales exemption. The Wage and Hour Division's Field Operation Handbook devotes an entire section to explaining why real estate agents fall under the outside sales exemption: they usually have the primary duty of sales and "typically are required, as customary and regular part of their employment, to spend time as necessary at the site of property to be sold and in visiting prospects at the latter's homes and offices as a part of their sales effort.  Most of them must leave whatever place of business of the employer they use as headquarters in order to perform these tasks." Dept. of Labor Wage and Hour Division, Field Operations Handbook § 22f06(b) (2016).

There can be no dispute that Benson's primary duty—indeed, his *only* duty—was to make real estate sales and procure real estate contracts on behalf of New Western.  Def. App. 194 (Benson Dep. 56:4-10).[9]  All the activities Benson performed were directly related to real estate sales.  Def. App. 005-006 (Castillo Decl. ¶ 14).

Benson's agent position required him to regularly and customarily to be outside the office performing activities, such as:

---

[9] "Q. [Defendants' counsel]: And your primary goal as a sales agent is to make real estate sales, right?

   A. [Benson]: My primary goal was to get investors to buy the properties, go to meet-ups, and, I mean, yeah, and have meetings in the office and make sales.

   Q. So your primary objective was to make sales?

   A. Yes."

- going to real estate showings (Def. App. 209-210 (Benson Dep.122:25-123:8));
- meeting with investors (Def. App. 199 (Benson Dep.76:2-8));
- meeting with homeowners to negotiate (Def. App. 207 (Benson Dep.108:5-18));
- getting estimates on properties (*id.*);
- driving around collecting addresses of potential properties for acquisition (Def. App. 208 (Benson Dep.113:14-24)); and
- networking (Def. App. 195 (Benson Dep. 59:6-24) (describing "meet up" networking events, which he claims he attended one to three times per week all over the DFW area)).

*See also* Def. App. 006 (Castillo Decl. ¶ 15). Benson testified that "most of time" he spent time in the afternoon meeting with investors and showing properties. Def. App. 199 (Benson Dep.76:2-8). He also described how he worked with many investors and, if an investor wanted to see a property and it was available, Benson would take them to see it. Def. App. 199 (Benson Dep. 75:7-20, 76:11-14).  Indeed, Benson stated that he did a great deal of driving as a New Western agent and spent "too much" money on gas.  Def. App. 189 (Benson Dep. 33:15-22).

Benson's tax returns also confirm how much of Benson's business time was spent out of the office. In 2017, for example, he reported expenses of $19,651 for standard mileage for 36,731 miles traveled (or over 700 miles each week of the year), and he attributed 100% of his vehicle use to "business use" that year. Def. App. 250, 256, 261 (Benson's 2017 tax return). Using an average speed of 45 miles per hour (to account for highway and residential city driving), Benson spent more than 15 hours per week driving alone, not to mention the time spent at the locations to which he was traveling. That same year, Benson reported spending $32,457 on client meals and meetings. Def. App. 260 (Benson's 2017 tax return). That sum equates to more than $600 in such expenses each week, all of which necessarily takes place outside of the office.

Not only are the out-of-office activities listed above considered in the outside sales analysis, but activities Benson performed *inside* the office that are "in conjunction with and in

furtherance of" real estate sales are considered work that is exempt from overtime. 29 C.F.R. § 541.503; Dept. of Labor Wage and Hour Division, Field Operations Handbook § 22f06(d) (2016). Those activities include calling sales prospects, talking to potential buyers or sellers in the office, and preparing contracts and other related forms. *Id.*; *see, e.g.,* Def. App. 196 (Benson Dep. 64:17-25) (discussing investor meetings in the office).

Other factors also support Benson's exempt outside sales status. Being paid on commission, as Benson was, is the "hallmark" of outside sales, as is receiving sales training and being in a profession requiring a license. *Martinez v. Superior HealthPlan, Inc*., 371 F. Supp. 3d 370, 384 (W.D. Tex. 2019). Like an exempt salesperson, Benson was tasked with obtaining his investor leads on United 10's behalf and, in fact, though he had the option to use United 10 leads, he declined to receive such leads. *Id.* (describing how receiving assigned leads can weigh against the outside sales exemption, but still finding that the exemption applied); Def. App. 206 (Benson Dep. 105:17-106:14). On the whole, Benson meets all the requirements for the outside sales exemption and his overtime claim should be dismissed. *See e.g., Martinez*, 371 F. Supp. 3d at 384 (finding that sales representatives tasked with soliciting clients to enroll in insurance plans fell under the outside sales exemption); *Meza v. Intelligent Mexican Marketing, Inc*., 720 F.3d 577 (2013) (affirming that a route salesman for a food and beverage company was an exempt outside sales employee).

**E.      All Defendants Other than United 10 Should Be Dismissed Because Only United 10 Can Possibly Be An "Employer" Under The FLSA.**

Despite the fact that Benson provided services for United 10 out of the Denton office and that Benson alleges United 10's General Manager controlled his activities, Benson nonetheless attempts to hold United 2, UI Holdings, and the three Individual Defendants liable as potential FLSA employers. He has no evidence to support such claims.

To qualify as an "employer" under the FLSA, Benson must show for each alleged employer that he/it: "'(1) possessed the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (citing *Williams v. Henagan*, 595 F.3d 610, 620 (5th Cir. 2010)). Since Benson attempts to hold more than one individual/entity as an "employer," he must make this showing as to each. *Id.* As shown below, he cannot.

According to Benson, he interviewed only with Mr. Castillo, who made the decision to engage him as an agent, and it was Mr. Castillo who he alleges controlled his day-to-day activities. Def. App. 190 (Benson Dep. 38:11-23; 76:2-8). Mr. Castillo established Benson's initial commission rates, and Benson later negotiated a change in commission rates with Mr. Castillo, who did not have to obtain approval to agree to such changes. Def. App. 204-205 (Benson Dep. 96:14-21, 99:5-16); Def. App. 005 (Castillo Decl. ¶ 12). And it was Mr. Castillo who made the decision to terminate Benson's IC Agreement. Def. App. 010-011 (Castillo Decl. ¶ 30).

No one else—specifically, none of the Individual Defendants—had any involvement in Benson's engagement, termination, rate of pay, or his day-to-day activities. Def. App. 052 (Hess Decl. ¶ 7).[10] Officers of a business are not, without more, "employers" under the FLSA. *Gray*, 673 F.3d at 355-56 ("[E]mployer status may be appropriate *where operational control coincides with one's position as a shareholder, officer, or owner*. The cases do not suggest, however, that merely being an officer or shareholder subjects an individual to FLSA liability.") (emphasis added); *see*

---

[10] Benson admits that none of the Individual Defendants worked in the Denton office, he rarely (if ever) saw them, and he communicated with them only a handful of times in two years (if at all). Def. App. 193, 195 (Benson Dep. 53:21-54:19, 61:1-15). Nor were any records regarding Benson's independent contractor relationship maintained by the Individual Defendants. Def. App. 052 (Hess Decl. ¶ 7). Even anecdotally, Benson has no reason to claim these individuals are his "employers"; he does not know who made the decision to classify agents as contractors, who establishes commission rates for agents, or where agents' records are kept. Def. App. 192 (Benson Dep. 48:1-15).

*also, Reneau v. Trung Nguyen*, No. 6:16-CV-01126-JDK, 2019 WL 348250, *4-6 (N.D. Tex. Jan. 9, 2019) (granting summary judgment for FLSA claims against individual defendants where none of the factors of the economic reality test were met).

Similarly, Benson cannot show that United 2 or UI Holdings satisfies *any* of the criteria required to impose FLSA liability. Neither United 2 or UI Holdings possessed the power to (or actually did) engage him, terminate his contractor agreement, supervise or control his work, determine his commission rate, or maintain records regarding his contractor relationship. Def. App. 052 (Hess Decl. ¶ 8). Indeed, as to UI Holdings, it is United 10's and United 2's parent company, and no employees or contractors work for UI Holdings. *Id.* For a parent entity to be liable for a subsidiary's FLSA violations, it must have "actual operation control" over the relevant workers. *Tharp v. Energes LLC*, No. 5:15-CV-983-DAE, 2016 WL 3352203, at *2-3 (W.D. Tex. June 15, 2016) (citing *Gray*, 673 F.3d at 355 ) (dismissing claims against a company that owned all the subsidiary defendant's stock because no evidence supported the parent entity's control over the subsidiary entity's workers).

As to United 2, although Benson had negotiated with United 2's General Manager to begin working out of the Fort Worth office, Mr. Castillo made the decision to terminate Benson's IC Agreement prior to that change taking place.  Def. App. 211 (Benson Dep. 129:16-21); Def. App. 010 (Castillo Decl. ¶ 29). United 2 made no decisions about Benson's compensation or his day-to-day activities for the 27 months he was engaged by United 10, nor did it maintain his employment records. Def. App. 052 (Hess Decl. ¶ 8). Benson lacks any evidence to hold these entities liable to him as an FLSA employer.  The claim against United 2 and UI Holdings should be dismissed.

**F.     If Any Alleged FLSA Violation Existed, It Was Not Willful.**

In the event that the Court finds a genuine dispute of fact regarding whether Benson is an FLSA employee or whether Benson was an exempt outside salesperson, it should nonetheless find that any alleged violation of the FLSA was not willful. The FLSA statute of limitations is two years for non-willful violations, and three years for willful violations. *Steele v. Leasing Enterprises, Ltd*., 826 F.3d 237, 248 (5th Cir. 2016). It is Benson's burden to show willfulness which requires evidence that Defendants "knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *Id.* (citing *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133–34 (1988)). Any alleged negligence by Defendants in purportedly misclassifying workers will not meet Benson's burden (*Steele*, 826 F.3d at 248), nor will general knowledge of the FLSA (*Tran v. St. Luke's Episcopal Health Sys*., No. CIV.A. H-11-0241, 2012 WL 3985219, at *2 (S.D. Tex. Sept. 11, 2012) (internal citation omitted)). Instead, where, as here, a company attempts to comply with FLSA and "sincerely, whether, correctly or not correctly, believed" an individual was being paid properly under the law, no willfulness should be found. *Id.*

There is no record evidence that any Defendant knew or showed reckless disregard in allegedly misclassifying employees as contractors (or as otherwise treating them as exempt from overtime). Benson was a statutory non-employee in an industry where agents are traditionally classified as independent contractors and paid solely on commission. New Western has periodically sought legal advice regarding the classification of its agents as contractors. Def. App. 053 (Hess Decl. ¶ 11). What is more, Benson admits he never complained that he believed he was an employee entitled to overtime and is not aware of any other agent who has done so. Def. App. 204 (Benson Dep. 95:1-10). Quite simply, Benson cannot meet his burden to show that Defendants committed a willful FLSA violation, and the statute of limitations should be limited to two years.

## IV.    CONCLUSION

Benson is not entitled to overtime under the FLSA, either as an independent contractor or as an exempt outside sales agent.  Moreover, no record evidence supports a finding that any of the named Defendants except for maybe United 10 can possibly be his employer under the FLSA or that any alleged FLSA violation of United 10 is willful.

WHEREFORE, Defendants pray that its Motion for Summary Judgment be granted and that an order be entered dismissing Benson's claims in their entirety.  In the alternative, Defendants pray that this Motion for Summary Judgment be granted in part, and that all Defendants other than United 10 be dismissed and that Benson's claim for damages be limited to two years.

Respectfully submitted,

*s/ Molly M. Jones*
Brant C. Martin
brant.martin@wickphillips.com
State Bar No. 24002529
Molly M. Jones
molly.jones@wickphillips.com
State Bar No. 24100271
Zachary C. Farrar
zachary.farrar@wickphillips.com
State Bar No. 24093418

WICK PHILLIPS GOULD & MARTIN LLP
100 Throckmorton Street, Suite 1500
Fort Worth, Texas 76102
Telephone: 817.332.7788
Facsimile:  817.332.7789

**ATTORNEYS FOR DEFENDANTS**
**UNITED INVESTEXUSA 10, LLC D/B/A**
**NEW WESTERN ACQUISITIONS, UNITED**
**INVESTEXUSA 2, LLC D/B/A**
**NEW WESTERN ACQUISITIONS,**
**UI HOLDINGS, LLC, STUART DENYER,**
**KURT CARLTON, AND PAUL HESS**

## CERTIFICATE OF SERVICE

On June 12, 2020, the foregoing document was electronically submitted with the Clerk of Court for the U.S. District Court, Northern District of Texas, using the electronic case filing system of the Court. I hereby certify that all counsel of record has been served electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*s/ Molly M. Jones*
Molly M. Jones