IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| KOYE "CORY" TEMILOLA BENSON, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CASE NO. 3:19-cv-01161-E |
| | § | |
| UNITED INVESTEXUSA 10, LLC D/B/A | § | |
| NEW WESTERN ACQUISITIONS, | § | |
| UNITED INVESTEXUSA 2, LLC D/B/A | § | |
| NEW WESTERN ACQUISITIONS, | § | |
| UI HOLDINGS, LLC, STUART DENYER, | § | |
| KURT CARLTON, AND PAUL HESS, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants' Motion for Summary Judgment (Doc. No. 32). Having considered the motion, response, reply, and applicable law, the Court finds the motion should be granted.

### BACKGROUND

Plaintiff Koye "Cory" Temilola Benson brings this action against defendants United InvestexUSA 10, LLC d/b/a New Western Acquisitions (United 10), United InvestexUSA 2, LLC d/b/a New Western Acquisitions (United 2), UI Holdings, LLC (UI Holdings), Stuart Denyer, Kurt Carlton, and Paul Hess, complaining they violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201, *et seq.*, by misclassifying Benson as an independent contractor and not paying overtime wages or offering any benefits that he would/should have been entitled to as a full-time employee (Doc. 55).

1

New Western Acquisitions (New Western) operates real estate brokerages around the country that buy and sell investment real estate properties (Doc. 34, p. 5).  Each brokerage is organized and operates as a separate entity (*Id.*, pp. 6, 54).  New Western contracts with real estate agents to facilitate property acquisitions and sales (*Id.*).  Acquisition agents find and acquire properties, which are typically distressed or undervalued, for New Western to sell, and sales agents locate investors to buy the properties (*Id.*).  New Western considers information about its properties and investors, which it stores in a proprietary software program, confidential and trade secret information (Doc. 34, p. 7).  Its real estate agents are required to maintain the confidentiality of the information and not use it for personal gain (*Id.*).

United 10 is a New Western brokerage in Lewisville, Texas (Doc. 34, p. 5).  In January 2016, Benson signed a New Western Independent Contractor Agreement (ICA) (*Id.*, pp. 17-26).  JD Castillo, United 10's general manager, also signed the ICA (*Id.*).  Benson was retained to perform the following services: "locate and acquire suitable real estate properties for acquisition (and/or assist with selling and/or disposing of real estate properties that New Western or its affiliates own)" (*Id.*).  The ICA had a one-year term, which was automatically extended for successive years unless terminated (*Id.*).

Pursuant to the ICA, Benson's sole earnings were commissions, which were paid only if a sale for which he served as either an acquisition or sales agent was consummated (*Id.*).  He was solely responsible for "the means and methods of work" in performing his services (*Id.*).  The ICA also imposed restrictive covenants, including provisions regarding preserving the confidentiality of information and a covenant not to compete for 24 months in the county and directly contiguous counties in which Benson principally worked (*Id.*).  New Western agents were able to hold other jobs; although other agents did, Benson did not (Doc. 34, pp. 13, 199).

2

According to Benson, his objectives were to acquire properties and make sales (Doc. 34, p. 197). Every agent's process was different (*Id.*, p. 197). Benson made contacts by attending meet-ups, which were gathering for investors and wholesalers to connect, and making phone calls (*Id.*). New Western provided leads, but Benson declined the leads, found his own investors and wholesalers, developed a close relationship with his investors, and built his own book of business (*Id.*, pp. 197, 200, 218).

The summary judgment evidence establishes that Benson was very successful as both an acquisition agent and sales agent (*Id.*, pp. 8, 197). He earned more commissions than almost any other United 10 agent (*Id.*, pp. 8, 196-197). Benson attributed his success to "work[ing his] butt off" and hustle:

> I just put my own grind into it. I did – I found ways to find – and I hustled and did everything else, you know. I found a different way to just find investors and just grind, and that was it.

(*Id.*, pp. 197, 206, 209). According to Benson, New Western did not have "a way" of doing the job. (*Id.*, pp. 209-210).

The ICA provided that Benson was to pay his own business expenses, and he used his own computer, cell phone, and vehicle, as well as spending money on other items, to locate properties and investors (*Id.*, pp. 10, 17-24, 203, 235-277). New Western did not reimburse Benson for these expenses (*Id.*). Benson could, and did, deduct his business expenses. (*Id.*).

In September 2017, Benson sought a higher commission rate, and Castillo "deactivated" him (Doc. 53, p. 141). After a month, he and Castillo came to an agreement on a higher commission rate (*Id.*, p. 141). While he was "deactivated," Benson formed KTB Compass Enterprises, LLC (KTB) and did a real estate transaction as KTB (*Id.*, pp. 138-142). Following his

reactivation, Benson continued to operate KTB and, thereafter, had United pay his commissions to KTB for tax purposes (*Id.*, p. 142).

The summary judgment evidence related to Benson's work conditions at United 10 is disputed. According to Castillo, United 10 does not have set office hours (Doc. 34, p. 10). Agents come and go as they wish and do not have to check in or out with Castillo during the day (*Id.*). Each agent has a desk to use at the office (*Id.*). New Western provides agents one or two polo shirts with New Western logos (*Id.*, p. 11). It expects agents to dress professionally for investor and homeowner meetings, but does not mandate that they wear anything specific (*Id.*).

On occasion, United 10 provides investor leads to agents (*Id.*). Investors, however, decide which investors to pursue (*Id.*, p. 12). An agent must have an investor sign a New Western investor agreement before showing properties to the investor, but Castillo does not have to meet or approve investors (*Id.*, pp. 11-12). Castillo encourages agents to meet with investors at the office, but they can meet at any location (*Id.*, p. 11).

Castillo held meetings and training sessions that were optional, but encouraged (*Id.* p. 10). About once a month, Castillo arranged an hour-long "call night," which was a learning opportunity for new agents to improve their phone skills (*Id.*, pp. 12-13). More experienced agents would listen to new agents make phone calls and provide feedback (*Id.*). Call nights also were encouraged, but not required (*Id.*). Castillo also encouraged, but did not require, agents to attend meet-ups for real estate investing professionals (*Id.*, p. 12). Castillo also encouraged agents to attend what he called "Texas Tuesday," a monthly real estate auction at the courthouse (*Id.*).

Benson, on the other hand, testified that Castillo "had control of everything that … [Benson] had to do" (*Id.*, p. 209). Although he did not have to clock in, Benson "had to be" at work at specific times, let Castillo know when he was going to lunch, and "ask for permission" to

4

take off for personal reasons (Doc. 53, p. 163-164).  He also was required to wear New Western "uniforms and shirts" to meet-ups (*Id.*, p. 183).

Benson was required to attend meetings in the office, meet-ups, and Texas Tuesdays (*Id.*, p. 161).  Castillo also required that Benson help with training and take new or prospective sales agents on "ride-alongs" (*Id.*, p. 162).  Benson had to drive around looking for distressed properties (*Id.*, p. 163).  He testified that he had no input in the design of his business cards and could not undertake his own ad campaigns (Doc. 34, p. 203; Doc. 53, p. 178).   His tax returns, however, indicate that he spent money each year on advertising and marketing (Doc. 34, pp. 203, 235-277)

Benson was scheduled to become an agent at United 2, a New Western brokerage in Fort Worth, at the beginning of April 2018 (*Id.*, p. 13).  Castillo, however, learned that Benson and KTB usurped a United 10 business opportunity earlier in the year and terminated the ICA on April 4, 2018 (*Id.*, pp. 13-14).

In June 2018, United 10 filed suit against Benson and KTB in state district court (state court case).[1]  United 10 asserted, among other things, that Benson breached the ICA by violating certain of its restrictive covenants (Doc. 34, p. 56).  United 10 filed a Motion for Partial Summary Judgment, requesting a ruling that the ICA was valid and enforceable and Benson breached it (Doc. 34, pp. 74-82).  In his response, Benson argued that he "was not an employee of [United 10] but was an independent contractor – a contractor owes no fiduciary duty (sic) a former employer" (Doc. 34, pp. 160-171).  The state court judge granted the summary judgment motion (Doc. 34, p. 182).

---

[1]  The state court case is styled *United InvestexUSA 10, LLC d/b/a New Western Acquisitions v. Koye "Cory" Temilola Benson and KTB Compass Enterprises, LLC*, Cause No. DC-18-08057, 298th Judicial District Court Dallas County, Texas.

Meanwhile, Benson filed this suit against defendants,[2] alleging failure to pay wages in accordance with the FLSA.  Defendants have moved for summary judgment on the following bases: (1) Benson admitted in the state court case that he was an independent contractor and, therefore, should be estopped from asserting a contrary position in this action; (2) Benson was an independent contractor and, therefore, not employed by defendants under the FLSA; (3) even if Benson were a United 10 employee, he is not entitled to overtime pay because he falls under the FLSA outside sales exemption; (4) Benson cannot establish that any defendant other than possibly United 10 qualifies as his "employer" under the FLSA; and (5) if Benson were covered by the FLSA, he cannot show that any defendant engaged in a willful violation of the statute.

## LEGAL STANDARD

Summary judgment is appropriate if, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).   "A fact is material if it might affect the outcome of the suit," and "[a] factual dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) (internal quotation marks omitted)).  A court must "resolve factual controversies in favor of the nonmoving party, but only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts."  *Antoine v. First Student, Inc.*, 713 F.3d 824, 830 (5th Cir. 2013) (citation omitted).

---

[2] The defendants, in addition to United 10 and United 2, are: (1) UI Holdings, the parent entity of United 10 and United 2; (2) Denyer, Chief Executive Officer of United 10 and United 2; (3) Carlton, Chief Technology Officer of United 10 and United 2; and (4) Hess, Chief Financial Officer and General Counsel of United 10 and United 2 (Doc. 34, pp. 53-54).

The movant bears the initial burden of showing the court there is no genuine issue for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A movant with the burden of proof on an issue "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in his favor." *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted). When a nonmovant bears the burden of proof, the movant may demonstrate it is entitled to summary judgment either by (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense, or (2) arguing there is no evidence to support an essential element of the nonmovant's claim or affirmative defense. *Celotex*, 477 U.S. at 322–25.

Once the movant has made this showing, the burden shifts to the nonmovant to establish there is a genuine issue of material fact so that a reasonable jury might return a verdict in its favor. *Id.* at 324. A nonmovant "cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Hathaway v. Bazany*, 507 F.3d 312, 319 (5th Cir. 2007) (internal question marks and citations omitted).

## ANALYSIS

At issue in this case is whether defendants mischaracterized Benson as an independent contractor, instead of as a non-exempt employee, and, as a result, failed to pay overtime compensation in violation of the FLSA. The FLSA requires an employer to pay overtime compensation to its non-exempt employees who work more than forty hours a week. *See* 29 U.S.C. §207(a)(1); *Faludi v. U.S. Shale Sols., L.L.C.*, 950 F.3d 269, 273 (5th Cir. 2020). To make a *prima facie* case for a violation of section 207(a)(1), a plaintiff must show: "(1) that there existed an employer-employee relationship during the unpaid overtime periods claimed; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the FLSA's

overtime wage requirements; and (4) the amount of overtime compensation due." *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citations omitted). An employee, subject to some exceptions, is defined as "any individual employed by an employer." 29 U.S.C. § 203(e)(1). Courts have adopted an "expansive definition of 'employee.'" *Parrish v. Premier Directional Drilling, L.P.*, 917 F.3d 369, 378 (5th Cir. 2019) (quoting *Usery v. Pilgrim Equip. Co., Inc.*, 527 F.2d 1308, 1311 (5th Cir. 1976)).

Whether a worker is an employee for FLSA purposes is a question of law, but the determination is "very fact dependent." *Parrish*, 917 F.3d at 380 (quoting *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 334 (5th Cir. 1993)). A summary judgment "on FLSA employee status can be granted when 'there are facts pointing in both directions,' *Carrell*, 998 F.2d at 334, so long as they do not generate a genuine dispute of material fact." *Id.*

1. *Judicial Estoppel*

Defendants first contend they are entitled to summary judgment because Benson is judicially estopped from claiming in this action that he was an employee when he asserted he was an independent contractor in his state court case summary judgment briefing.[3]

"The doctrine of judicial estoppel prevents a party from asserting a position in a legal proceeding that is contrary to a position previously taken in the same or some earlier proceeding." *Ergo Sci., Inc. v. Martin*, 73 F.3d 595, 598 (5th Cir. 1996). For judicial estoppel to apply, (1) the party's position must be clearly inconsistent with its earlier position, and (2) the court must have accepted the earlier position. *Hopkins v. Cornerstone Am.*, 545 F.3d 338, 347 (5th Cir. 2008).

---

[3] Defendants previously sought leave, which the Court granted, to amend their answer and affirmative defenses to include judicial estoppel (Docs. 23, 54). Benson objected to the amendment and now re-urges his objection and asks the Court to strike defendants' judicial estoppel argument. The Court overrules the objection.

Pleading independent contractor status in another suit does not necessarily preclude an FLSA plaintiff from suing as an employee. *See Hopkins*, 545 F.3d at 347–48 (holding FLSA plaintiff was not judicially estopped from, and there was no legal inconsistency in, suing employer as employee despite plaintiff pleading independent contractor status in prior suit against him for sexual harassment). Further, it "is well-established that '[t]he common law concepts of 'employee' and ['independent contractor'] have been specifically rejected as determinants of who is protected by the [FLSA].'" *Parrish*, 917 F.3d at 379 (quoting *Usery*, 527 F.2d at 1311); *see also Nationwide Mut. Ins. Co. v. Darden,* 503 U.S. 318, 326 (1992) (noting FLSA "stretches the meaning of 'employee' to cover some parties who might not qualify as such under a strict application of traditional agency law principles"). Indeed, a plaintiff may be an employee under the FLSA even if he actually believes he is an independent contractor. *Hopkins*, 545 F.3d at 347. Accordingly, Benson's position that he is an employee for purposes of his FLSA claim in this case is not clearly inconsistent with his position that he was an independent contractor in defending the breach of contract claim in the state court case. The Court, therefore, finds summary judgment on the basis of judicial estoppel is improper.

2. *FLSA Employee Status*

Defendants next assert they are entitled to summary judgment because Benson was an independent contractor and, thus, not entitled to overtime compensation under the FLSA. To determine whether a worker qualifies as an employee, a court must determine if "as a matter of economic reality, the worker is economically dependent upon the alleged employer or is instead in business for himself." *Hopkins*, 545 F.3d at 343. Neither the parties' intent nor the label they use to describe their relationship controls whether a worker is an employee. *See Watson v. Graves*, 909

9

F.2d 1549,1554 (5th Cir. 1990) ("We must ... look to the substantive realities of the relationship, not to mere forms or labels ascribed to the laborer by those who would avoid coverage.").

For this determination, courts consider five non-exhaustive factors: (1) the degree of control exercised by the alleged employer; (2) the extent of the relative investments of the worker and the alleged employer; (3) the degree to which the worker's opportunity for profit or loss is determined by the alleged employer; (4) the skill and initiative required in performing the job; (5) and the permanency of the relationship. *Hopkins*, 545 F.3d at 343. No factor is determinative; "[i]nstead, the focus is on 'an assessment of the 'economic dependence' of the putative employee[]." *Parrish*, 917 F.3d at 380 (quoting *Brock v. Mr. W Fireworks, Inc.*, 814 F.2d 1042, 1043–44 (5th Cir. 1987)).

### A.     Control

"Control is only significant when it shows an individual exerts such a control over a meaningful part of the business that [the individual] stands as a separate economic entity." *Id.* at 381 (quoting *Usery*, 527 F.2d at 1312–13). Here, there is no dispute that Benson controlled the means and methods of the services he provided pursuant to the ICA (Doc. 34, p. 209). He located and cultivated relationships with contacts and investors, who entered into real estate transactions, and earned commissions based on his success. This weighs significantly in favor of independent contractor status. *See Parrish*, 917 F.3d at 381.

Benson, however, argues that United 10 and, particularly, Castillo exercised a high degree of control over his work. As evidence, he cites requirements that he (1) use New Western's software platform and assign "his work" to New Western, (2) obtain an investor's signature on a New Western agreement before showing a property, (3) locate potential properties under deadline, (4) attend call meetings and meet-ups (and wear a uniform shirt at marketing events), (5) take

new or prospective sales agents on ride-alongs and help with other training, (6) carry business cards that he had no discretion in designing, and (7) maintain a work schedule and ask permission to take off for personal reasons.  Benson further complains that, when he broke protocol, Castillo could, and did, "deactivate" Benson, which precluded him from contacting investors for a time. Benson also testified that he was unable to conduct his own ad campaigns, although his tax returns indicate that he incurred advertising and marketing expenses during each year he worked for United 10.

To be sure, the summary judgment evidence regarding what was, or was not, required of Benson as an agent is disputed with facts that point in both directions.  However, that does not preclude summary judgment unless the dispute is material.  *See Faludi*, 950 F.3d at 275–76.  And, even assuming United 10 exercised day-to-day control over Benson's work schedule and required compliance with certain protocols, that is not sufficient to show employer control that prevents a worker from standing as a separate economic entity.  *See Parrish*, 917 F.3d at 381.

In *Parrish*, directional drillers contended their alleged employer controlled their day-to-day activities, including their work schedule, demanding compliance with "company policies and procedures," requiring "special permission" to leave the workplace, and mandating report be filed in a "preferred format."  *Id*.  The alleged employer also provided an already-designed well plan and decided what equipment would be at the drill and who could operate the drill.  *Id*.  On these facts, but also considering that the drillers could choose to accept or reject projects and the alleged employer did not control how they completed their directional-drilling calculations, the Fifth Circuit determined the control issues favored independent contractor status.  *Id.; see also Thibault v. Bellsouth Telecomm.*, 612 F.3d 843, 847-48, 851 (5th Cir. 2010) (plaintiff was independent contractor, even though his supervisor required certain work schedules, kept time records, and

provided blueprints, but did not specify how plaintiff should undertake his primary task of splicing high voltage cables).

United 10 never required that Benson work with certain properties, sellers, or investors; he chose which property acquisitions and sales he wanted to pursue.  He was responsible for building his own book of business on behalf of United 10.  Indeed, he specifically declined United 10 leads and concedes that he used his own hustle and methods to locate investors and properties, consummate sales, and earn his commissions.  Nor does the fact that Benson was subject to several restrictive covenants, including a covenant not to compete, automatically negate independent contractor status.  *Faludi*, 950 F.3d at 276 (holding non-compete clause that prohibited consultant from working for alleged employer's competitors while agreement was in effect and for one year afterward did not negate consultant's independent contractor status).  Because the evidence shows Benson exerted control over the meaningful part of his business, the Court finds this factor weighs in favor of independent contractor classification.  *See, e.g., Parrish,* 917 F.3d at 381-82.

## B.  Relative Investments

The Court next evaluates "the extent of the relative investments of the worker and the alleged employer," comparing "the amount the alleged employer and [worker] each contribute to the specific job the [worker] undertakes."  *Id.* at 383 (quoting *Thibault*, 612 F.3d at 847).  Here, Benson paid for items, including his vehicle, computer, cell phone, and his real estate license, that were necessary to perform his agent services.  His 2016, 2017, and 2018 tax returns also show he incurred advertising, legal and professional, office, travel, entertainment, and other business expenses.  These types of expenditures support independent contractor status.  *See, e.g., Faludi*, 950 F.3d at 276 (plaintiff who provided his own computer, phone, and continuing education expenses was an independent contractor); *Eberline v. Media Net, L.L.C.*, 636 F. App'x 225, 228 (5th Cir.

12

2016) (finding independent contractor status where plaintiffs provided, in part, their own tools and supplies).

United 10, however, provided its agents with office space, paperwork, including contracts, procedures, training, and use of its platform and confidential information to generate leads (Doc. 34, pp. 9-10, 12). These expenses benefitted Benson's work, but also supported the work of other United 10 agents and served to develop and protect its confidential information, business interests, and goodwill (Doc. 34, p. 228). Under the facts presented, the Court finds this factor is neutral or, at most, slightly favors employee status. *See Parrish*, 917 F.3d at 383 (finding this factor favors employee status, but "merits little weight in the light of the other summary-judgment-record evidence supporting [independent contractor] status").

### C. Profit and Loss

The third factor to evaluate is "the degree to which the worker's opportunity for profit or loss is determined by the alleged employer." *Hopkins*, 545 F.3d at 343. The court must determine how the worker's "profits [depend] on [his] ability to control [his] own costs." *Carrell*, 998 F.2d at 334.

Benson's opportunity to earn profits depended heavily on his efforts. He had to find investors and build his own book of business. He only had earnings if he sold or acquired properties on behalf of United 10. He took steps to increase his profits by successfully negotiating for a higher commission rate in 2017. Benson also determined which expenses to incur to support his business. Evidence of his tax returns is instructive. *See Carrell*, 998 F.2d at 334. For example, Benson's tax returns show that he invested considerably more money in advertising, marketing, and client entertainment in 2017 than 2016, and his 2017 profit almost tripled. *See Parrish*, 917 F.3d at 384

13

(plaintiffs' control over their expenses affected their profits and supported independent contractor status); *see also Carrell*, 998 F.2d at 333–34.

United 10 determined Benson's profit and loss to some extent. For example, Castillo "deactivated" him, rendering him unable to work for periods of time when he deviated from United 10 protocol. Additionally, the ICA's restrictive covenants clearly limited Benson's ability to earn profits by providing the same services on his own or working for a competitor. However, the Court finds that, because Benson determined how, when, and with whom to engage with respect to each potential real estate transaction and what expenses to incur in support of his business, this factor favors independent contractor status.

### D.  Skill

Next, the Court must evaluate "the skill and initiative required in performing the job." *Hopkins*, 545 F.3d at 343. "Greater skill and more demonstrated initiative" favor independent contractor status. *Parrish*, 917 F.3d at 385. Thus, a court must determine if the plaintiff has "some unique skill set … or some ability to exercise significant initiative within the business." *Hopkins*, 545 F.3d at 345 (internal citations omitted).

Benson, a licensed real estate agent, was very successful at his work, and he attributes his success to his own methods and initiative. In his response, however, he asserts that using his "hustle" to meet and market to new investors was simply a requirement of his job, just like attending meet-ups, assigning his "work" to New Western, and being subject to a covenant not to compete.[4] The Court disagrees and finds Benson's ability to secure investors, sales, and, as a result, profits

---

[4]  To the extent Benson is asserting that the ICA covenants abrogated his initiative by limiting his opportunity to work, the Court disagrees. Although the ICA precluded Benson from competing with United 10 in certain counties, it did not prevent him from other work so long as the covenants were not violated and it clearly did not prevent him from exercising his skill and initiative as a United 10 agent. *See Faludi*, 950 F.3d at 275–76.

based upon his personal initiative weighs in favor of independent contractor status. *See, e.g., Hickey v. Arkla Indus., Inc.*, 699 F.2d 748, 752 (5th Cir. 1983) (finding gas-products salesperson was independent contractor when he earned only commissions and his profit depended on his initiative and skill to increase customer volume).

### E.  Permanence

The final factor for a court to evaluate is "the permanency of the relationship." *Hopkins*, 545 F.3d at 343.  In doing so, the court may consider the length of the relationship, whether a plaintiff "worked exclusively" for the defendant, and whether the work was on a "project-by-project basis." *Parrish*, 917 F.3d at 386–87 (citing *Hopkins*, 545 F.3d at 343, and *Carrell*, 998 F.2d at 332). "Steady and reliable" employment over a "substantial period of time" favors employment status. *Cromwell v. Driftwood Elec. Contractors, Inc.*, 348 F. App'x 57, 61 (5th Cir. 2009).

Benson worked for New Western for 27 months (Doc. 34, pp. 54-55).  The ICA had a one-year term, but was subject to automatic renewals.  Other than providing some services for different New Western entities and undertaking a transaction or two on his own, Benson worked for United 10 (Doc. 34, pp. 54-55).  Moreover, under the ICA, Benson was subject to the covenant not to compete, which prevented him from performing the same services for himself or competitors in Denton County or contiguous counties. The fact that he could have taken on some other work is not relevant; instead, "the analysis is focused on economic reality, not economic hypotheticals." *Parrish*, 917 F.3d at 381–87.  Thus, the Court finds Benson's work for United 10, which was mostly reliable and steady, weighs in favor of employee status.

In determining FLSA employee status, the presence or absence of one single factor is not determinative. *See Eberline*, 636 F. App'x at 227 (quoting *Hopkins,* 545 F.3d at 343).  There are considerations under each factor supporting a finding that Benson is economically dependent on

United 10 – the covenant not to compete is perhaps the most significant of these to the Court. However, considering the undisputed facts, the factors weigh in favor of independent contractor status and a finding that, as a matter of economic reality, Benson was in business for himself. Accordingly, the Court finds the FLSA does not apply to Benson and defendants are entitled to summary judgment on his claims against them.

3.    *Outside Sales*

Defendants next assert that, even if Benson were an FLSA employee, he is an exempt outside sales employee who is not entitled to overtime pay. *See* 29 U.S.C. § 213(a)(1). Benson first responds that defendants waived this affirmative defense by failing to sufficiently plead it.

An employer's claim that an employee is exempt is an affirmative defense to an FLSA claim. *See Corning Glass Works v. Brennan*, 417 U.S. 188, 196-97 (1974). "A defendant must plead an affirmative defense with enough specificity or factual particularity to give the plaintiff 'fair notice' of the defense that is being advanced." *Rogers v. McDorman,* 521 F.3d 381, 385 (5th Cir. 2008) (citation omitted); FED. R. CIV. P. 8(c). However, if an affirmative defense "is raised in the trial court in a manner that does not result in unfair surprise, ... technical failure to comply precisely with Rule 8(c) is not fatal." *Id*.

Here, defendants pleaded that "[t]he claims in the Complaint are barred to the extent that [Benson] falls under one or more of the FLSA's exemptions, exclusions, exceptions, or credits from overtime obligations, including, but not limited to, those set forth in Section 7 and/or Section 13 of the FLSA" (Docs. 6, 55). "Section 7" refers to 29 U.S.C. § 207, and "Section 13" refers to 29 U.S.C. § 213, which lists exemptions, including the outside sales exemption, to the FLSA. *See* 29 U.S.C. § 213(a)(1); *see also Galera v. Relief Net Rd. Servs., Inc.*, No. 3:13-cv-4723-L, 2015 WL 1931364, at *4 (N.D. Tex. Apr. 28, 2015). The Court finds defendants' pleading was sufficient to

give Benson fair notice that defendants were asserting the outside sales exemption affirmative defense. *See Galera*, 2015 WL 1931364, at *4 (citations omitted). Additionally, Benson does not claim that he suffered prejudice and has fully briefed the merits of the issue. *See Rogers*, 521 F.3d at 387 ("prejudice inquiry considers whether the plaintiff had sufficient notice to prepare for and contest the defense"); *Huddleston v. Chucks Transp. Inc.*, No. 5:17-1228, 2019 WL 164959, at *8 (W.D. Tex. Jan. 9, 2019) (finding no prejudice for failure to plead FLSA exemption where plaintiff extensively briefed the exemption). Accordingly, the Court finds defendants did not waive the affirmative defense.

Outside sales employees are exempt from the FLSA overtime provisions. 29 U.S.C. § 213(a)(1). An outside sales employee is an employee (1) whose "primary duty" is "making sales within the meaning of section 3(k)" of the FLSA or "obtaining orders or contracts for services ... for which a consideration will be paid by the client or customer" and (2) who is "customarily and regularly engaged away from the employer's place or places of business in performing such duty." 29 C.F.R. § 541.500(a). A "sale" is "any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 U.S.C. § 203(k).

An employee's primary duty is the "principal, main, major, or most important duty that the employee performs." 29 C.F.R. § 541.700(a). To determine primary duty, courts consider factors including "the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee." *Id.* "[W]ork performed incidental to and in conjunction with the employee's own outside sales ... shall be regarded as exempt work" in determining the employee's primary duty. *Id.* § 541.500(b). Exempt work for an

17

outside sales employee also includes "work that furthers the employee's sales efforts," such as "writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences." *Id.* If an employee spends at least 50% of his time engaged in exempt work, that work is probably the employee's primary duty. *Id.* § 541.700(b). Real estate salespeople generally meet the test. *See* Department of Labor Wage and Hour Division Opinion Letter FLSA 2007-2, 2007 WL 506575, at *3 (Jan. 25, 2007) (FLSA 2007-2).[5]

Benson testified that his primary objective was to make real estate sales and procure real estate contracts on behalf of New Western (Doc. 34, p. 197). And, more specifically, he testified that his "primary goal" was to "get investors to buy the properties, go to meet-ups, and, I mean, yeah, and have meetings in the office and make sales" (*Id.*). As discussed above, United 10 did not directly supervise Benson's sales work. And, other factors, including that his commissions-only earnings incentivized sales and he was licensed and trained in real estate sales, further support that Benson's primary duty was to make sales. *See Martinez v. Superior HealthPlan, Inc.*, 371 F. Supp.3d 370, 384 (W.D. Tex. 2019).

Benson nevertheless asserts evidence that he regularly did tasks for which he earned no commission and was not free to come and go as he pleased creates a fact issue as to his outside sales status:

> there were days I didn't have closings and things like that and times of the month and weeks I didn't have closings, and I was still working and everything else, and having to be in the office, having to do meetings, having to do trainings, having to do drive-alongs, having to do marketing, drive and add properties to the New Western campaign…."

---

[5]   Department of Labor opinion letters are "not controlling," but "constitute a body of experience and informed judgment as to which courts and litigants may properly resort for guidance." *See Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944).

(Doc. 53, p. 158). The fact that Benson also participated in training sessions, marketing tasks, and property searches that may not have furthered his own sales, however, is not sufficient to raise a fact issue when the summary judgment evidence shows the majority of his work, and his primary duty, was pursuing sales for which he earned a commission or work that was incidental to and in conjunction with his sales. Accordingly, the Court finds that Benson's primary duty was making sales. *See, e.g., Martinez*, 371 F. Supp.3d at 381–82.

"Customarily and regularly" means "greater than occasional" but "less than constant" and includes work "normally and recurrently performed every workweek." 29 C.F.R. § 541.701. In an opinion letter, the Department of Labor considered whether real estate sales employees who worked out of model homes or trailers qualified as exempt outside sales employees. FLSA 2007-2, 2007 WL 506575. The employees spent one or two hours a day one or two days a week working outside of their worksite. *Id.* at *1. These outside activities included "meeting with prospects, realtors, or others involved in the home buying process; showing properties and communities to prospects; touring and demonstrating model homes and home sites; and meeting with customers, realtors, construction personnel, and others to ensure customer satisfaction." *Id.* Because this work was critical to the employees' overall sales effort, they qualified as employees "customarily and regularly engaged away from the employer's place or places of business in performing [their primary] duty." *Id.* at *3.

The summary judgment evidence shows that Benson, likewise, customarily and regularly conducted sales business, attending real estate showings, meetings with homeowners, and networking functions to meet contacts and investors, locating potential properties for acquisitions, and obtaining property estimates, outside of the United 10 office. Benson testified that "most afternoons" he would call or go look at properties (Doc. 34, pp. 202, 212-213). If an investor

wanted to see a property and it was available, Benson would take them to see it (*Id.*).  He attended sales meetings out of the office and met with homeowners at their homes (*Id.*, pp. 202, 210).   He also made contacts and met investors by attending out-of-office meet-ups at least once, twice or, sometimes, three times a week (*Id.*, pp. 197-198).  Benson testified to doing a great deal of driving for work, and his 2017 tax return shows he traveled 36,731 miles for business, with a standard mileage expense of $19,651 (*Id.*, pp. 259-260).  Benson's 2017 tax return also shows a deductible meals and entertainment business expense of $16,228 after incurring expenses of $32,457 for "MEETING WITH CLIENTS MEALS" (*Id.*, pp. 253, 263).

To raise a fact issue, Benson cites to evidence that all of the sale closings occurred at the United 10 office and, according to his response, "overwhelmingly a large number if not the majority of [his] calls" also were conducted at the office (Doc. 52, p. 28; Doc. 53, p. 213).  However, there is no requirement that a sale closing, or significant sales-related work, occur away from an employer's office.  *See Dixon v. Prospect Mortg., LLC*, 11 F. Supp.3d 605, 610 (E.D. Va. 2014).  Instead, courts look to "whether the employee performs tasks critical to the sales process away from the office on a greater than occasional basis."  *Id.* (citing FLSA2007–2, 2007 WL 506575, at *4).  "Making sales is not an activity that necessarily occurs at one time and/or in one location, but, rather, may comprise a number of component activities. Where some of those component activities take place at a fixed site and others take place outside of a fixed site, the employee is properly classified as an outside sales employee if the activities occurring outside of the office are critical to the sales process and occur on a consistent basis."  *Id.* (quoting *Wong v. HSBC Mortg. Corp.*, 749 F. Supp.2d 1009, 1013 (N.D. Cal. 2010)); *see also* Department of Labor Wage and Hour Division Opinion Letter FLSA 2007-1, 2007 WL 506574, at *3 (Jan. 25, 2007) (sales associates were properly classified as outside sales employees when they customarily and regularly engaged in

activities "critical to the sales process" while outside of the office, in particular, showing properties to prospective buyers, despite initially meeting prospective buyers and, later, closing sales in employer's sales offices).

The summary judgment evidence demonstrates that Benson, on a greater than occasional basis and normally and recurrently each workweek, performed activities outside the United 10 office, including finding and showing homes and locating investors, that were critical to his overall sales efforts. Accordingly, Benson was "customarily and regularly engaged away from" United 10's place of business in performing his primary duty. The calls, closings, and investor meetings that took place in the office, because they were "in conjunction with and in furtherance of" his real estate sales, are also relevant to the outside sales analysis and qualify as exempt work. *See* 29 C.F.R. §§ 541.500(b), 541.503.

FLSA exemptions are to be fairly, and not narrowly, construed. *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018). As described above, the Court finds the summary judgment evidence establishes that Benson meets the requirements for the outside sales exemption and, therefore, he was exempt from the FLSA overtime provisions. *See e.g.,* FLSA2007–2, 2007 WL 506575, at *4; *Martinez*, 371 F. Supp.3d at 386 (sales representatives tasked with soliciting clients to enroll in insurance plans fell under the outside sales exemption). For this reason, alternatively, defendants are entitled to summary judgment on Benson's claims against them.

## CONCLUSION

Because the undisputed summary judgment evidence shows Benson was an independent contractor, the FLSA does not apply to him and defendants are entitled to summary judgment on his claims against them for failure to pay wages in accordance with the FLSA. Even if Benson were an employee, the summary judgment evidence also establishes that he was an outside sales

21

employee, exempt from the FLSA wage provisions.[6]

For these reasons, Defendants' Motion for Summary Judgment (Doc. 32) is **GRANTED**. Benson's claims against defendants are **DISMISSED with prejudice**.  The Court will enter a final judgment consistent with this order.

**SO ORDERED**; signed March 18, 2021.

_____
ADA BROWN
UNITED STATES DISTRICT JUDGE

---

[6] Having found that Benson was not an FLSA employee and, even if he was, he was an exempt outside sale employee, the Court need not address defendants' remaining arguments regarding whether defendants qualify as FLSA employers or engaged in a willful violation.

Defendants also lodged several objections to certain evidence included in Benson's appendix in support of his response to the summary judgment motion (Doc. 47).  The Court, having considered the objections in reviewing the parties' briefing and the exhibits at issue, overrules those objections.

22